19 F.3d 1431
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Henry SMALLS, a/k/a Red, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
George MOULTRIE, a/k/a Pookum, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Wade FERRELL, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Otto WITHERSPOON, a/k/a Toe, Defendant-Appellant.
 Nos. 92-5900, 93-5045, 93-5088, 93-5135.
 United States Court of Appeals, Fourth Circuit.
 Argued Feb. 11, 1994.
Decided March 21, 1994.
 
 Appeals from the United States District Court for the District of South Carolina, at Charleston. Solomon Blatt, Jr., Senior District Judge. (CR-91-288-2)
 John Dewey Elliott, Columbia, S.C.; Dennis Eugene O'Neill, Mt. Pleasant, S.C., for appellants.
 Benjamin A. Hagood, Jr., Asst. U.S. Atty., Charleston, S.C.; Mark C. Moore, Asst. U.S. Atty., Columbia, S.C., for appellee.
 William L. Runyon, Jr., Charleston, S.C., for appellant Moultrie;
 N. Elliott Barnwell, Charleston, S.C., for appellant Ferrell.
 J. Preston Strom, Jr., U.S. Atty., Charleston, S. C., for appellee.
 D.S.C.
 AFFIRMED.
 Before WILKINSON and HAMILTON, Circuit Judges, and MERHIGE, Senior United States District Judge for the Eastern District of Virginia, sitting by designation.
 OPINION
 HAMILTON, Circuit Judge:
 
 
 1
 In this consolidated appeal, appellants, Otto Witherspoon (Otto), Wade Ferrell, George Moultrie, and Henry Smalls, appeal the judgment entered by the district court in their respective cases. Finding no error, we affirm.
 
 
 2
 * This case involves a conspiracy to possess with intent to distribute and to distribute heroin and cocaine in Charleston, South Carolina from January 1980 until August 1991. The conspiracy was headed by Oster Witherspoon, Otto's brother, with Otto assuming the role of second in command. Smalls' role included travelling to New York to acquire drugs and acting as a street dealer. Moultrie and Ferrell were essentially street dealers.
 
 
 3
 In August 1991, the appellants, along with thirty others, were charged in a thirty-five count superseding indictment with various violations of federal statutes. The appellants were charged, along with twenty-eight others, with conspiracy to possess with intent to distribute and to distribute heroin and cocaine, 21 U.S.C.Secs. 841(a)(1) and 846. In addition, Otto was charged with operating a continuing criminal enterprise (CCE), 21 U.S.C. Sec. 848; money laundering, 18 U.S.C. Sec. 1956(a)(1); and various substantive drug offenses. Ferrell was also charged with possession of a firearm by a convicted felon, 18 U.S.C. Sec. 922(g)(1). The indictment also charged Smalls with possession of a firearm by a convicted felon, 18 U.S.C. Sec. 922(g)(1); possession of a firearm during and in relation to a drug trafficking crime, 18 U.S.C. Sec. 924(c), and two substantive drug offenses.
 
 
 4
 The case was tried before a jury during twenty days between October 15, 1991 and November 20, 1991. Over fifty witnesses testified for the government, including unindicted and indicted coconspirators. All of the appellants were convicted of the conspiracy count. Smalls was also convicted of the two counts charging him with substantive drug offenses, but was acquitted of the two counts involving firearms.
 
 
 5
 Otto was convicted of the CCE count and various substantive drug counts. Otto was sentenced to 315 months' imprisonment; Smalls to 168 months' imprisonment; and Ferrell and Moultrie to 150 and sixty months' imprisonment, respectively.
 
 
 6
 The appellants noted a timely appeal to this court.
 
 II
 
 7
 On appeal, the appellants raise numerous assignments of error, only one of which merits discussion. The appellants argue that the jury selection process in this case constituted reversible error.
 
 
 8
 * Fifteen defendants participated in the jury selection. The district court originally proposed giving the government nine strikes and all of the defendants fifteen strikes collectively, allowing the defendants to decide how they would exercise their strikes. The district court proposed a method whereby any objection to peremptory challenges would be made immediately after the challenge and the district court would immediately rule on the objection prior to presenting the next juror. At the request of various defendants, and absent the objection from any defendant, the district court finally decided to allow each defendant to exercise two strikes and the government eighteen strikes.
 
 
 9
 The defendants initially elected to "strike as a group," (J.A. 217), arriving at a consensus on whether to strike and to whom the strike would be allocated and having one spokesman strike for all defendants. Seven jurors were selected in this manner. The first juror presented to the district court was a white manager with a college degree whom the defendants struck. The government objected to the strike and the district court asked the reasons for the strike. Counsel for one of the defendants to whom the strike was allocated stated that the juror was struck because she was a store manager with supervisory responsibilities and thus more likely to identify with the government. The district court overruled the government's objection and excused the juror.
 
 
 10
 The second juror presented was a white legal secretary whom the government struck without objection. The third juror presented was a black tradesman, who was seated without strike or objection. The fourth juror presented was a black teacher with a college degree, who was also seated without strike or objection. The fifth juror presented was a white controller with a college degree. She was struck by the defendants with the strike allocated to Ferrell. The government objected to the strike and the district court requested a reason for the strike. Ferrell's attorney stated: "She is a controller, she lives in--on Swing About Drive, which would be an upscale area in Hilton Head. I don't believe she has anything in common with my client economically, and I think she would lean toward--lean toward the government." (J.A. 222). The district court sustained the government's objection and seated the juror. The district court stated:
 
 
 11
 I sustain the government's objection. That is not a valid race neutral reason. That's the same reason that--that's just because she lives--she is a controller and lives in what you think, you don't even know, may be an upbeat neighborhood, that's no reason for me.
 
 
 12
 Id. The sixth juror presented was a white teacher with a college degree and she was struck by the defendants with the strike allocated to Otto. After the government objected, Otto's counsel stated that she was struck because she was a teacher and might be paternalistic and overly protective. The district court found no race neutral reason in striking the sixth juror because Otto failed to object to the fourth juror who was a black teacher with a college degree. The district court then seated the sixth juror. The district court also observed for the record that the defendants had not conferred on either of the two black jurors that had been presented, quickly "jump[ing] on both of them," whereas it was evident that the defendants had conferred on each of the four white jurors who had been presented. (J.A. 225A-26).
 
 
 13
 The seventh juror presented to the district court was a white state constable who was struck by the defendants without objection. The eighth juror presented was a black, college educated naval shipyard employee and the ninth juror presented was a white, retired mill worker with a high school degree. Both were seated without strike or objection. The tenth juror presented was a white shipyard worker with a high school degree. The defendants' spokesman requested that the juror be sworn but two defendants stated that they thought "we were going to strike the juror." (J.A. 231). The government objected and counsel for one of the defendants stated that he struck the juror because he believed that some of the naval shipyard workers were very biased and would not make good jurors; he also stated he exercised a strike to protect his client. The district court sustained the objection and seated the juror finding no race neutral reason because the defendant failed to strike the eighth juror, a black naval shipyard worker.
 
 
 14
 The defendants then requested a change in the jury selection procedure whereby each defendant would exercise his own strikes rather than through a single spokesman. The district court granted this request. Thereafter, each defendant with strikes remaining was individually asked to seat or excuse each juror.
 
 
 15
 From that point on, only two jurors that were presented to the district court were seated over a defendant's strike. The first juror, a white, college educated driver was struck by a defendant because of the way he was dressed. The district court found no race neutral reason for the strike, sustained the government's objection, and seated the juror. The second juror (the second alternate), a white maintenance man with a trade school education, was struck by a defendant because of his appearance. The district court again found no race neutral reason.
 
 
 16
 The record reveals that all of the defendants collectively exercised approximately eighteen other strikes than those previously mentioned. Many of these strikes were objected to by the government but upheld by the district court. Of these other strikes, approximately three were exercised against blacks and approximately fifteen against whites. The jury selected consisted of seven blacks and five whites. Two black and two white alternates were also seated.
 
 B
 
 17
 Almost thirty years ago, in Swain v. Alabama, 380 U.S. 202, 222-24 (1965), the Supreme Court held that racially motivated use of peremptory strikes by the government violates the dictates of the Equal Protection Clause. The evidentiary standard announced in Swain posed a formidable burden on the defendant. Under Swain, in order to establish a prima facie violation of the Equal Protection Clause by a prosecutor's exercise of peremptory challenges, a defendant bore the burden of demonstrating an inference of purposeful discrimination. Id. at 223. An inference of purposeful discrimination was established where the defendant demonstrated that the prosecutor "in case after case, whatever the circumstances, whatever the crime and whoever the defendant or the victim [ ], [was] responsible for the removal of Negroes who [had] been selected as qualified jurors by the jury commissioners and who have survived challenges for cause, with the result that no Negroes ever serve[d] on petit juries." Id.
 
 
 18
 In Batson v. Kentucky, 476 U.S. 79 (1986), the Court eased the "crippling" burden of proof imposed on the defendant. The Batson Court held that a criminal defendant, in establishing an Equal Protection Clause violation, no longer had the burden of showing systematic discrimination, that is the repeated striking of blacks over a number of cases, but rather need only demonstrate that discrimination occurred in the selection of his jury. Id. at 92-93. The Court outlined a three-step approach to assist lower courts in determining whether peremptory strikes were employed in a discriminatory manner. First, the defendant must make a prima facie showing that the peremptory strikes were exercised on the basis of race. Second, if this showing is made, the burden shifts to the government to come forward with a race neutral explanation for the strike. If the government offers a racially neutral explanation, the defendant may nevertheless show racial discrimination by demonstrating that the explanations were pretextual. Id. at 93-98; United States v. Joe, 928 F.2d 99, 102 (4th Cir.), cert. denied, 112 S.Ct. 71 (1991).
 
 
 19
 Swain and Batson have now been expanded to the level of universal application. See Powers v. Ohio, 111 S.Ct. 1364, 1373 (1991) (permitting criminal defendant to challenge race-based use of peremptory strikes regardless of defendant's own race); Edmonson v. Leesville Concrete Co., 111 S.Ct. 2077, 2081-87 (1991) (permitting civil litigants to challenge race-based use of peremptory strikes); Georgia v. McCollum, 112 S.Ct. 2348, 2353-59 (1992) (permitting the government to challenge race-based use of peremptory strikes by criminal defendant). Accordingly, criminal defendants are prohibited from exercising their peremptory strikes in a racially discriminatory manner. McCollum, 112 S.Ct. at 2359 (extending Batson three prong test to a criminal defendant's use of peremptory challenges).[1]
 
 
 20
 Because the district court is in a much better position to evaluate the demeanor and candor of the attorney exercising the strike, the district court's factual findings on racial motivation are entitled to "great deference" and are reviewed for clear error. Batson, 476 U.S. at 98 n. 21; United States v. Grandison, 885 F.2d 143, 146 (4th Cir.1989), cert. denied, 495 U.S. 934 (1990). The district court in this case did not make a specific finding on the record that a prima facie showing had been established. The district court simply proceeded to hear the reasons articulated for the strike and proceeded to decide whether the strike amounted to purposeful racial discrimination. The appellants claim this was reversible error. We disagree.
 
 
 21
 We begin here with another cautionary note:
 
 
 22
 [T]he favored method for a district court to use in evaluating a [challenge under Batson and its progeny] is initially to determine whether the [non-striking party] has shown a prima facie violation when the issue is first raised. If the court finds a prima facie case of discrimination, it should require the [striking party] to articulate reasons for exercising its peremptory challenges to remove members of the [struck juror's] racial group. The court should then determine if the reasons presented by the [striking party] are facially neutral. If so, the court should provide the [nonstriking party] with the opportunity to establish pretext and then issue a specific ruling on each juror in question supported by its findings of fact and its rationale for its ruling.
 
 
 23
 Joe, 928 F.2d at 103. Despite this favored approach, we will refrain from addressing the question of whether a prima facie showing was established where the striking party has articulated its reasons for its strikes. Id.; United States v. Lane, 866 F.2d 103, 105 (4th Cir.1989). Cf. Hernandez v. New York, 111 S.Ct. 1859, 1866 (1991) ("Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant made a prima facie showing becomes moot.")." This approach is reasonable since 'appellate review should not become bogged down on the question of whether the defendant made a prima facie showing in cases where the district court has required an explanation.' " Lane, 866 F.2d at 105 (quoting United States v. Forbes, 816 F.2d 1006, 1010 (5th Cir.1987)). The reasoning behind this rule "stems from the district court having already made findings upon the factual issues." Joe, 928 F.2d at 103-04. Accordingly, while it is best for the district court to first make a factual determination on the prima facie issue before seeking an explanation for the strike, its failure to do so does not constitute reversible error.
 
 
 24
 The appellants in this case apparently attack only the seating of the fifth and sixth jurors that were presented to the district court. Both jurors were white, and they were struck by black defendants. This fact alone raises the suspicion of discrimination because a racial motivation is certainly more likely to exist where the party exercising the strike is of a different race than the juror struck. Powers, 111 S.Ct. at 1373-74 ("Racial identity between the defendant and the excused person ... may provide one of the easier cases to establish both a prima facie case and a conclusive showing that wrongful discrimination has occurred.").
 
 
 25
 We cannot take issue with the district court's determination that the strikes exercised against the fifth and sixth jurors that were presented to the court were a part of a pattern of discriminatory strikes. At the time when the fifth and sixth jurors were struck, the defendants were exercising their strikes together and they had seated without objection the two black jurors presented (the third and fourth jurors presented) and had struck the only white juror presented (the first juror presented).[2] The district court observed that the defendants were quickly accepting without discussion the black jurors but were conferring visibly on each of the white jurors.
 
 
 26
 The reason articulated for striking the fifth juror presented was: "She is a controller, she lives in--on Swing About Drive, which would be an upscale area in Hilton Head. I don't believe she has anything in common with my client economically, and I think she would lean toward--lean toward the government." (J.A. 222).
 
 
 27
 It could be reasonably asserted that the fifth juror presented was improperly struck. See United States v. Pofahl, 990 F.2d 1456, 1466 (5th Cir.1993) (holding economic status to be race neutral reason for exercise of peremptory strike). Although a juror's economic status can be a racially neutral explanation for a strike, the circumstances surrounding the jury selection process in this case suggest that the defendants were motivated by racial reasons. As the district court observed early in the process, the defendants had not conferred about either of the two black jurors that had been presented, but visibly conferred among themselves on the white jurors that had been presented. In light of the "great deference" that must be accorded to the district court's finding and its unique ability to judge the credibility of the attorney exercising the strike, it cannot be said that the district court's finding of purposeful racial discrimination with respect to the fifth juror presented is clearly erroneous.
 
 
 28
 Nor can we take issue with the district court's finding that the reason for striking the sixth juror presented was racially motivated. The defendants' belief that a white teacher with a college degree would be too paternalistic and overly protective could reasonably be viewed as pretextual in light of the defendants' failure to strike a black juror with a similar background.
 
 
 29
 In summary, under the circumstances, we do not believe any error, let alone reversible error, was committed by the district court during the jury selection process. We glean from the record that the district court went out of its way to accommodate the appellants, allowing the fifteen defendants at least ten more strikes than what was otherwise mandated by Fed.R.Crim.P. 24(b).[3]
 
 III
 
 30
 The appellants raise numerous other assignments of error. Our review of the record reveals that these contentions have no merit. Accordingly, the judgments of the district court are affirmed.
 
 
 
 [1]
 The jury in this case was selected prior to the Supreme Court's decision in McCollum. However, the district properly applied the dictates of McCollum, which extends Batson and its progeny to prohibit a criminal defendant from exercising racially motivated peremptory challenges
 
 
 [2]
 The second juror presented to the district court was struck by the government
 
 
 [3]
 To the extent that the appellants attack the manner in which the district court selected the jury, see Appellant's Brief at 16 ("The jury selection method employed by the District Court was fatally flawed throughout, and the defects inherent in that process require reversal and a new trial."), we find this argument to be without merit